## HAMMON CONSOLIDATED GOLD FIELDS v. POWELL.

### SAME v. POWELL et al.

#### Nos. 6024, 6025.

Circuit Court of Appeals, Ninth Circuit.

April 28, 1930.

O. D. Cochran, of Nome, Alaska, and Pillsbury, Madison & Sutro, of San Francisco, Cal. (Alfred Sutro and Eugene M. Prince, both of San Francisco, Cal., of counsel), for appellant.

Thomas R. Lyons and Ira D. Orton, both of Seattle, Wash., for appellees.

Before DIETRICH and WILBUR, Circuit Judges, and NETERER, District Judge.

DIETRICH, Circuit Judge.

In legal posture these two cases are substantially the same and arise upon the identical contract considered in Hammon Con. G. Fields v. Powell (C. C. A.) 32 F.(2d) 855, qualifying opinion on petition for rehearing (C. C. A.) 33 F.(2d) 898. In that case was involved only the minimum annual payment due December 1, 1927, and we held that, inasmuch as appellant had not attempted to withdraw from or terminate the contract until thirty days thereafter, it could not escape the obligation which had thus fully matured.

The suits were brought to recover minimum payments which, if the contract remained in force after December 31, 1927, matured December 1, 1928. The circumstances and conditions rendering two actions necessary, and certain incidental issues, need not here be explained; nor is it important that upon the overruling of appellant's demurrers to the complaints it raised certain issues of fact, and that, touching such issues, evidence was introduced. As in the former case, the controlling question is of the meaning and effect of the contract therein considered. That, in writing on December 30, 1927, appellant gave notice of its surrender of the contract as of December 31, 1927 (reserving only certain temporary rights as provided in the contract), and thereupon tendered possession of the property, is conceded. In short, if at that time the appellant had the right under the terms of the instrument to surrender and terminate it, it is in effect conceded that neither case exhibits a cause of action, and both judgments should be reversed. The real issue, therefore, is whether, as contended by appellant, the contract is primarily and essentially one granting to it an option to purchase the mining property therein described with the incidental right, so long as the option remained in effect, to hold possession of and operate the property; or, as appellees contend, the transaction was primarily an unconditional lease for a fixed period with an optional right to purchase as a mere incident.

Though the contract is of great length, a comprehensive statement of the terms thereof seems unavoidable. It bears date July 10, 1923, and is between the Nome Dredging Trust and Hammon Consolidated Gold Fields, therein and hereinafter styled respectively the "Trust" and "Gold Fields." To it are attached schedules or descriptions of four different groups of properties in the Cape Nome Mining District, Alaska, identified as "A," "B," "C," and "D." In the preamble it is recited that the property covered by "A" was owned by the Trust and mortgaged to one E. E. Powell, trustee; the property

in "B" was owned by the Alaska Dredging Company, and E. E. Powell owned the properties covered by "C" and "D." It is further recited that the Trust could procure leases and options to purchase all of such properties not owned by it, and that Gold Fields desired to accept its offer to sell all personal property and lots enumerated in "A," to grant a mining lease and option to purchase the properties described therein, and to convey its right, title, and interest in and to the mining claims, arising or to arise under the leases and options it had taken or was to take upon the properties enumerated in "B," "C," and "D."

The first six paragraphs following the preamble have to do with the personal property and town lots enumerated in "A," which apparently had some essential relation to the operation of the mining properties. The Trust agreed to sell and Gold Fields agreed to buy all thereof for an amount equal to the balance then remaining due on the Powell mortgage, approximately $150,000 besides interest, to be paid, $50,000 on September 1, 1923, $25,000 on November 1, 1924, and $80,000 on November 1, 1925. The obligation of Gold Fields was, however, made subject to the right at its option at any time prior to December 1, 1923, to terminate the entire contract, in which contingency it was to redeliver possession of all the property covered by the contract to the Trust and was to be discharged from all obligations thereunder, and the Trust was to retain the $50,000, which, as we have seen, was payable by Gold Fields on September 1, 1923. In case payments were made in full for the lots and personal property the Trust was to deliver to Gold Fields a satisfaction of the mortgage thereon, a bill of sale for the personal property, and a deed for the lots. And paragraph 6 provides:

"In the event that Gold Fields shall not exercise or shall surrender the option for the purchase of the mining ground hereinafter contained then on demand Gold Fields will reconvey to the Trust, the said town lots, together with the tenements, hereditaments and appurtenances thereunto belonging."

Paragraph 7 requires the Trust within a specified time to procure from the several owners, "leases and options to purchase" covering the properties listed in schedules "B," "C," and "D," form of which agreement is attached to the contract; and, it may be added, these were so procured. The price to be paid for the "B" properties was $292,200, the minimum annual payments on account thereof being $10,000 for each of the years 1925 and 1926, and for each year following $20,000, with interest after January 1, 1929. The price of the "C" property was to be $616,400 with minimum annual payments in 1925 and 1926 of $10,000 and $25,000 thereafter, with interest from January 1, 1931. For the "D" properties the price was to be $80,000 with minimum annual payments of $5,000 in 1925 and 1926, and $10,000 thereafter with interest from January 1, 1931.

Paragraphs 8, 9, and 10 are as follows:

"8. For and in consideration of the foregoing agreement to purchase the said personal property and town lots, the Trust hereby grants unto Gold Fields a mining lease of and option to purchase all and singular the other real property enumerated in Schedule A and all the right, title, interest, and estate vested or to vest in the Trust in and to the property enumerated in Schedules B, C and D under and by virtue of the mining leases and options specified in Article 7 or otherwise for the price and upon terms and conditions, as hereinafter set forth."

"9. The purchase price of the said real property owned by the Trust and mentioned in Article 8, and of the trust's said right, title, interest and estate in the real property enumerated in Schedules B, C and D shall be $600,000, payable in full, together with interest on any unpaid balance after January 1, 1931, at the rate of four per cent. per annum, prior to the expiration of the term of this option, provided, however, that the minimum amount paid annually on account of purchase price shall be $25,000, commencing in the year 1925. The said payments on account of purchase price shall also be deemed to be and shall constitute rental for the use and occupation of the said mining property hereby demised and leased for the full term of said lease, and when payment in full of said purchase price, together with interest (if any) accrued thereon, shall have been made, then there shall be no further obligation to pay any other or further rental or royalties to the Trust, but the obligation to pay any and all unpaid balances of the purchase price, together with interest (if any) accrued thereon, pursuant to each of the said options and leases of the real property enumerated in Schedules B, C and D, shall continue, if the same shall not then have been fully paid and discharged."

"10. The term of said lease and option shall commence on the date of these presents and shall continue to and including December 31, 1935 (unless sooner terminated as hereinafter provided)."

Paragraph 11, in so far as material, is as follows:

"11. On or before August 15, 1923, the Trust will deliver unto Gold Gields possession of all and singular the mining property enumerated in Schedules A, B, C and D, and subject only to the obligation to pay royalties and/or minimum annual payments to the respective owners, as provided herein and in and by the said other leases and options, Gold Fields shall have the right, as long as this agreement shall remain in effect, to mine and extract all precious and other metals and minerals, and, upon payment of the said royalties, to appropriate the same to its own use."

Paragraphs 14, 15, and 31 provide for the use by Gold Fields of an existing dredge, for the installation by it of another dredge of a specified type and, conditionally, for a third dredge ready for operation upon the opening of the 1926 mining season. But at the option of Gold Fields it could either use these two additional dredges upon the properties covered by the contract or remove them to other ground; and it had the right at any time entirely to cease and suspend operations upon the contract properties, provided only it should be under obligation to make annual payments out of royalties or otherwise aggregating the minimums specified and hereinbefore stated. Paragraphs 16, 17, and 18 particularize the royalties to be paid by Gold Fields upon gold recovered in the course of operation, and have little bearing on the present issue. Paragraph 19 provides that, in case such royalties in any year should not equal the required minimum payments for such year, Gold Fields was to pay the difference on or before December 1st of that year; "provided, however, if the total purchase price and accrued interest shall not have been paid on or before December 31, 1935, then any unpaid balance will be so deposited on or before said date."

Paragraph 20 requires of Gold Fields the keeping of accurate and detailed accounts of operations upon and recoveries from each of the several claims described in the four schedules.

Paragraph 21 is as follows:

"21. Gold Fields will pay to the respective owners of the real property enumerated in Schedules B, C and D, the royalties and/or minimum annual payments specified in the respective leases of and options for said real property in the manner and form therein specified, and in general will do and perform all things to be performed by the Trust un-der the terms and conditions of said leases and options as long as this agreement shall remain and be in effect."

Paragraphs 22, 23, 24, 25, 26, and 32 have to do in the main with the subject of titles and the execution and deposit of title papers and their delivery upon specified conditions in case Gold Fields ultimately purchased the property, and are of little materiality here.

Paragraph 27 has to do with the rights of the parties in case the Trust should exercise its option to terminate the contract for any default on the part of Gold Fields; it is set out in full in 33 F.(2d) 898. Paragraph 28 provides that, notwithstanding such termination, Gold Fields should continue to own, with right of removal, all personal property and all structures erected by it; and paragraph 29, that in case of such termination Gold Fields should reconvey the town lots to the Trust and would remove its dredges and other property belonging to it in the manner prescribed, all to the end that the Trust should again be put in full and exclusive possession of the real property. Paragraph 30 is of no consequence. The only material part of paragraph 33 is:

"33. The Trust covenants and agrees that for the term of twelve years next hereafter (if Gold Fields shall remain in possession under this agreement during such term or shall have completed payments hereunder), it will not engage in mining in said Cape Nome Mining and Recording District and will not acquire any right, title, interest or estate in mining ground therein."

By paragraph 34 there is imposed upon Gold Fields the obligation to do the assessment work upon all unpatented claims "as long as this agreement shall be in effect." By paragraph 35 it is provided that if Gold Fields should acquire adverse title to any property covered by the agreement it should hold such title as trustee for the Trust until it (Gold Fields) should become entitled to conveyances under the contract, "and if this agreement shall be terminated prior to that time it (Gold Fields) will make conveyance of such title to the Trust." The last three paragraphs, 36, 37, and 38 are without materiality here, excepting, possibly, that, departing from the phraseology used in some other parts of the instrument, the contract is referred to as "this option," and the property as being "under option," without use of the term "lease."

The "leases and options" which the Trust was to, and did, secure from the owners of

schedules B, C, and D follow very closely the phraseology of the principal agreement, and establish relations between the Trust and the owners substantially the same as the relation between the Trust and Gold Fields created by their agreement. The distinctive paragraph which seems to contemplate an absolute obligation on the part of Gold Fields only so long as it remained in possession, is as follows:

"Permission is hereby given to the Trust to place Hammon Consolidated Gold Fields, a corporation organized under the laws of the State of Maine, in possession of the property covered by this agreement with the right to work and operate under the terms hereof, upon the express assumption of the Trust's obligations and liabilities hereunder by said Hammon Consolidated Gold Fields, and in such event and as long as said Hammon Consolidated Gold Fields shall so remain and be in possession the Owner will look exclusively to it for performance of such obligations and will release the Trust from all liabilities therefor."

We doubt whether any useful purpose would be served by an elaborate comment upon the several provisions and numerous phrases of the instrument, arrayed upon one side of the controversy or the other by the contending parties. Terms and phrases there are which tend to support either of the opposing theories. In the most favorable view to appellees we think it can be said only that the intent of the parties is left in doubt, and upon full consideration we have been unable to escape the conviction that appellant's construction is the more reasonable. In construing the equivocal phraseology, two or three general considerations have not been without weight with us. It is well known that in dealing with mining properties an option to purchase is generally accompanied with the privilege to the optionee of possession and the right to develop or operate the mining claims; otherwise he would be unable to secure the information requisite to an intelligent exercise of his option. And, as a consideration therefor, the owner receives either a payment in bulk or a stipulated sum periodically, or a percentage of the recoveries realized from operation—one or more. The estate thus created relating to possession is not unlike that of a leasehold, and the consideration may not improperly be referred to as rental. And to safeguard the owner and protect him from a demand for the repayment of moneys so received upon a withdrawal of the optionee and the termination of the contract, care is generally exercised so to characterize payments thus made. The use, therefore, of such terms in the contract here is not of conclusive significance. We are further to note that the appellees must and do concede that, in so far as concerns the purchase of the property, the contract is a pure option; at will Gold Fields was at liberty either to purchase or to decline to purchase. With that consideration in mind it seems to us wholly improbable that it would have bound itself unconditionally to make the minimum payments prescribed for the full period of twelve years, or that appellees would have expected it knowingly to enter into such an undertaking. If at the end of three or four or five years of operation it was forced to the conclusion that the properties could not be profitably worked, under appellees' view it could terminate operations and surrender possession, but it could not cease making the minimum annual payments until the end of the twelve-year period. Referring to the properties listed in "B," "C," and "D," we find that the total purchase price of the first group was to be $292,200, and the minimum payments which, under appellees' theory, it was bound to make, aggregate $200,000—a somewhat unusual "option." The price to be paid for group "C" was $616,400, and the required payments under that theory aggregate $245,000. For the "D" group the price was to be $80,000, and the aggregate required payments for the term would be $100,-000, or at least the full amount of $80,000. In short, as to this last group, though appellees concede that the contract is, in respect of purchase, but an option, under their theory it becomes in fact an absolute obligation to pay the entire purchase price. And considering the three groups together, under their theory Gold Fields bound itself absolutely to pay $525,000, on account of an option to purchase for an aggregate price of $988,600. This in face of fact that in the owners' contracts it is expressly provided that only as long as Gold Fields "shall so remain and be in possession the owner will look exclusively to it for performance of such obligations."

In view of the conclusion we have reached upon this primary question, it is unnecessary to consider the further contention of Gold Fields that the Trust did not have the power to make a contract such as this would be if construed in harmony with appellees' theory.

The judgments are reversed, with directions to take further proceedings not out of harmony with the views herein expressed.